GEORGE ENGER & COMPANY, Appellees, v. CHARLES LOFLAND, Trustee, Appellee, A. W. SWALM AND THE KRATZER CARRIAGE COMPANY, Appellees, S. B. JONES AND THE OSKALOOSA NATIONAL BANK, Interveners, Appellants, JOSEPH A. JONES, Defendant, Appellant.

**Services by Child:** PRESUMPTIONS AS TO COMPENSATION. Before a son can recover for services rendered to his father, while a member of his father's family, he must rebut the legal presumption that such services were rendered gratuitously, by satisfactory evidence.

SAME: *Evidence.* On the issue of a father's liability for wages for services rendered by a son while a member of the family, the presumption that such services were rendered gratuitously, and the father's denial of any agreement to pay wages, are not overcome by the son's testimony and a book, kept by him without his father's knowledge, which shows that accounts had been altered, that the entries were not made at the time they purported to be, and that the memoranda of alleged settlements were made at one time.

**Decree:** WHO MAY BENEFIT BY: *Pleading.* A creditor who has not pleaded fraud as to a note given to a third person, which, with his own, was secured by a chattel mortgage from the common debtor, cannot claim the benefit of a decree which, as between other parties and the payee of the note, found the note and the mortgage *pro tanto* fraudulent.

*Appeal from Mahaska District Court.*—Hon. D. Ryan, Judge.

Friday, December 11, 1896.

Joseph Jones, the father of the appellant, Joseph A. Jones, on November 4, 1893, executed to appellee, Lofland, trustee, a chattel mortgage on his personalty to secure an indebtedness to appellant, the Oskaloosa National Bank, also a claimed indebtedness of two thousand five hundred dollars on a note to his son, Joseph A. Jones. At the time of the execution of this mortgage, Joseph Jones was insolvent. On the day on which said mortgage was executed, plaintiffs commenced an action in the district court of Mahaska county, Iowa, against Joseph Jones, on certain promissory notes, aggregating about seven hundred dollars, the action being aided by attachment, and the Oskaloosa National Bank and Lofland being attached as garnishees. Thereafter, and in the order named, A. W. Swalm and the Kratzer Carriage Company commenced suits in the same court against Joseph Jones, aided by attachment, and garnished the same parties. Judgment was entered against Joseph Jones in each of said cases. November 20, 1893, the defendant, Lofland, trustee, foreclosed his chattel mortgage by notice and sale, realizing therefrom about two thousand eight hundred dollars. Plaintiffs, in their petition, alleged the insolvency of Joseph Jones and Joseph A. Jones. They charged that the note for two thousand five hundred dollars, given by Joseph Jones to Joseph A. Jones, was fraudulent as to the creditors of said Joseph Jones, and asked that the trustee be restrained from paying any portion of the proceeds of the sale of the mortgaged property to Joseph A. Jones, and that he be directed to apply that portion which would have gone to Joseph A. Jones, on the

claims of the plaintiffs. They also asked and secured a temporary injunction restraining the payment of any money to Joseph A. Jones. Thereafter A. W. Swalm and the Kratzer Carriage Company intervened in said suit, and claimed the same relief. Appellant, the Oskaloosa National Bank, intervened in said cause, and alleged that Joseph Jones was indebted to it in the sum of two thousand one hundred and fifty dollars, and interest on two notes, and the further sum of three thousand dollars, as guarantor of certain notes which he had sold to said bank; that he had executed to Lofland, trustee, a chattel mortgage to secure the two notes first mentioned, and also to secure the bank to the extent of two thousand dollars from damage or loss by reason of the non-payment of the guarantied notes; that the property had been sold, and the proceeds were held by the trustee for distribution. It prayed that all the proceeds might be paid to it. Appellant S. B. Jones intervened, alleging that Joseph Jones executed a note to the Oskaloosa National Bank (being one of the two notes on which the bank claims); that she signed said note as surety for said Joseph Jones, and that one thousand seven hundred dollars, with interest, was due thereon; that Joseph Jones executed the mortgage heretofore mentioned, to Lofland, trustee, to secure the payment of said note; that it had been foreclosed, and the proceeds were in the hands of said trustee; that said proceeds were insufficient to satisfy the sums secured by said mortgage; that the mortgage from Joseph Jones to Joseph A. Jones was fraudulent. Joseph A. Jones answered plaintiff's petition, admitting the execution of the mortgage to Lofland, trustee, and that it secured two thousand five hundred dollars due to him, and denied all other allegations in the plaintiff's petition. Said Jones also filed answers to the the petition of intervention of S. B. Jones and the Oskaloosa National Bank, admitting

that he held a mortgage for two thousand five hundred dollars, that he secured the appointment of the trustee, and denied all other allegations of said petition. He asks that the entire amount in the hands of the trustee be turned over to him in payment of his mortgage. From the answers of the garnishees it appears that Trustee Lofland sold the mortagaged property, and that, after paying expenses, there remained in his hands about two thousand eight hundred and thirty-two dollars, to be paid to whoever is entitled thereto. The attachment proceedings were all consolidated with the main case, and tried as one action. The district court found that the note given by Joseph Jones to Joseph A. Jones, and secured by the chattel mortgage, was fraudulent and void as against plaintiff and the interveners Swalm, the Kratzer Carriage Company, and S. B. Jones; that Joseph Jones was not indebted to Joseph A. Jones when said note was given; that Joseph A. Jones, at the time of the alleged debt, was living with his father as a member of his father's family, and was supported and maintained by his father; and that no agreement existed between them that the father should pay for the son's services. The court also finds: That the attaching creditors and S. B. Jones are entitled to that portion of the funds in the hands of the trustee arising from the sale of the mortgaged property, which would have gone to Joseph A. Jones had the mortgage not been fradulent as to him, to be paid to them in the following order: *First*, to plaintiffs; *second*, to Swalm; *third*, to the Katzer Carriage Company; and, *fourth*, to S. B. Jones. That the bank is entitled to that portion of the fund in the hands of the trustee that, under the terms of said mortgage, it would have been entitled to as against Joseph A. Jones had the mortgage been valid as to him. Further orders were made as to the basis of prorating the funds of the trustee, not now necessary

to be more fully noticed. From this decree, Joseph A. Jones, S. B. Jones, and the Oskaloosa National Bank appeal.—*Affirmed.*

*J. B. Bolton* for appellant Joseph A. Jones.

*Geo. W. Seevers* for appellants Oskaloosa National Bank and S. B. Jones.

*J. C. Morgan* for appellees.

KINNE, J.—I. As to the appeal of Joseph A. Jones: The court below found that Joseph Jones was not indebted to his son, Joseph A. Jones, at the time the note was executed by the father to the son, and that said note was fraudulent and void as against creditors heretofore mentioned. The appellants insist that this finding is not in accordance with the evidence. The senior Jones had for a great many years, and up to the time of his failure in 1893, been engaged in the business of manufacturing carriages in Oskaloosa, Iowa. Joseph A. Jones entered his father's service in said business when about sixteen years of age, and continued to work in the business until shortly before his father's failure. During all of these years, until 1891, Joseph A. Jones was a member of the family of his father, lodging and boarding with the family, and being clothed by his father. It appears that the father, from time to time, gave the son money, and paid his bills, of which no account was kept. When the son was sixteen years of age, he began working in the father's factory at the agreed price of seventy-five cents per day. That agreement, however, is not relied upon by the parties in this controversy. The son claims that, when he was twenty years of age, the father agreed to pay him thereafter one dollar per day and board. This arrangement, it is claimed, was made

January 1, 1878. The son also claims that on October 11, 1883, he had a settlement with his father, at which time there was found due the son, after allowing all proper credits, the sum of nine hundred dollars. He also claims that this balance due him was to be paid by transferring to him a one-third interest in the business after his father got out of debt. Another settlement is claimed to have been had on January 1, 1886, when the father executed a note to the son for one thousand one hundred and fifty-nine dollars and eighty-five cents, the balance then claimed by the son. A new agreement is claimed to have been entered into at that time as to the wages to be paid the son, and a further arrangement on January 1, 1887, which continued until August, 1892, when a settlement was had, and a note for two thousand five hundred dollars executed by the father to the son, which is the note in controversy in this action. The father denies all of these agreements and settlements testified to by the son, except he admits the execution of the two notes mentioned. Up to January 1, 1891, Joseph A. Jones kept his father's books, which showed the details of the business, including the employes' accounts and the amounts paid each of them as wages. During all of these years, from January, 1878, up to January, 1891, no account appears in the father's books with the son, excepting a few items in the year 1880, aggregating about five dollars. After January 1, 1891, the father kept the books, and opened an account with the son, to whom he was then paying wages; and, as appears, from that time, until he ceased working for his father, he received in money more than his wages amounted to. The only account kept of the work claimed to have been done by Joseph A. Jones for his father prior to 1891, or of the money paid him, was entered in a small pass book by Joseph A. Jones himself; and we think it appears that it was never examined by the

father, and for a long time he had no knowledge that such a book was being kept by the son.

The rule was laid down in *Scully v. Scully's Ex'r*, 28 Iowa, 548, that "when it is shown that the person rendering the service is a member of the family of the person served, and receiving support therein, a presumption of law arises that such services were gratuitous; and in such a case, before the person rendering the service can recover, the express promise of the party served must be shown, or such facts and circumstances as will authorize the jury to find that the services were rendered in the expectation by one of receiving, and by the other of rendering, compensation therefor." See, also, *Saar v. Fuller*, 71 Iowa, 425 (32 N. W. Rep. 405); *Manufacturing Co. v. Mastin*, 75 Iowa, 112 (39 N. W. Rep. 219); *Chadwick v. Devore*, 69 Iowa, 640 (29 N. W. Rep. 757); *Magarrell v. Magarrell*, 74 Iowa, 380 (37 N. W. Rep. 961). The appellant, Joseph A. Jones, having rendered the services, for which it is claimed the note in controversy was given, while a member of the family of his father, the burden is on the son to overcome the presumption which the law raises, that such services were rendered gratuitously. The claim of appellant is that the services were rendered under an express agreement to pay therefor, and he so testifies. In support of this claim, he introduced a pass book which he kept, and which contains entries purporting to show the number of days he worked for his father, and the amount of money paid him by his father. All the entries in it, except those touching claimed settlements, are in pencil, and have the general appearance of being made at one time. Many of them show clearly that the figures have been changed, and others substituted. The entries relating to settlements, though referring to settlements claimed to have been made with an interval of years intervening, appear to have been made with the same ink and

pen, and at the same time. These alleged settlements the father expressly denies, and says he never saw the entries. Some evidence was introduced on both sides as to statements made by the father to various parties, touching an indebtedness to the son. These statements are conflicting. The father explains giving the one thousand one hundred and fifty-nine dollar note, saying he did it to save having a fuss in the family. As to the note now in controversy, he said: "Well, I couldn't settle with him without having some kind of a statement of the account, and told him to that effect; and he went to work and made the statement out at once, in two or three days getting it out. He finally brought it to the shop one afternoon, when I was very busy, working for some men at the time; and he had a roll of papers where he had made that out, and he said it was in there, and it was all figured out, and said there was a balance of two thousand five hundred dollars. He left the statement on my office desk in there, and I was to look through that when I had the leisure, and, if there was anything wrong about it, we would rectify it. I signed the note, and the men waiting on me at the time. I went away, and left the note and that statement with Joe. Joe took that statement with him, and put it in his pocket. and that is the last I ever saw of that statement." He says he never examined the statement; that he did not know how much he owed the son at that time. All the testimony of the father relative to this last note may be entirely consistent with his claim, that the only agreement he ever made with the son, was to work for seventy-five cents per day; and inasmuch as no account had been kept in the father's books, with the son, and the father had from time to time paid the son money, and paid his store bills, he had no means of actually knowing the condition of matters between them. However, as we have

already said, the claim of the son is not based in any manner on the original arrangement admitted by both father and son, whereby the former was to pay the son seventy-five cents per day. We do not think that it is shown that the father had knowledge of the contents of this book, kept by the son, so that it can be said that he in any manner assented to the correctness of the entries therein contained. The fact that the son, who was the bookkeeper, did not keep his account with his father in the father's books, the manner in which the account has been changed, the indications that the entries were not made at the time they purport to be, and the fact that the memoranda of the alleged settlements appear to have all been made at one time, with the same ink, as well as many other facts which might be recited, convince us that, as evidence, the book is not reliable. Nor is the explanation which the son gives as to why he did not keep his account on the father's books, satisfactory or reasonable. It will not do to say that this book, kept by the interested party, and under the circumstances we have in part recited, and showing numerous changes and alterations, should be deemed sufficient, in connection with the testimony of Joseph A. Jones, to overcome that of his father, and of the presumption which the law raises against his right to recover for the services which he has rendered. A careful examination of all the evidence fully warrants the conclusion reached by the district court as to this branch of the case.

II. As to appellant, the Oskaloosa National Bank: The appellant claims that the court erred in its order of distribution of the proceeds of the mortgaged property in the hands of the trustee. They claim that the bank should first have its claim paid in full, regardless of the attaching creditors. The funds in the hands of the trustee are insufficient to pay the bank's claim. It will be remembered that

the district court ordered paid to the interveners and plaintiff "that portion of said funds which, under the terms of said mortgage, would have gone to the defendant, Joseph A. Jones;" and that, "for the purpose of prorating the said fund, the share going to plaintiff and interveners shall be based on the sum of $2,500, being the amount of the alleged claim of A. Jones, the defendant; and that the share going to the Oskaloosa National bank shall be based on the sum of $2,150, plus amount of notes on which Joseph Jones is collaterally liable to said bank as guarantor, which are covered by said mortgage, and which are found uncollectible and worthless." Now, the bank did not attack the note for two thousand five hundred dollars, given by Joseph Jones to Joseph A. Jones, and secured by the mortgage, as being fraudulent. No such issue was made by it. So far, then, as the bank is concerned, its right to the fund collected under the mortgage is to be measured and determined as if the note and mortgage given to Joseph A. Jones were valid and binding obligations. Not having pleaded fraud as to the note and mortgage, the bank is in no situation to claim the benefit of a decree, which, as between other parties and Joseph A. Jones, finds said note and mortgage fraudulent.

III. As to the appeal of S. B. Jones: S. B. Jones signed, as surety for Joseph Jones, one of the notes which he gave to the Oskaloosa National Bank, and which was secured by the mortgage given to the bank, and to Joseph A. Jones. She asks that the fund in the trustee's hands be all applied in payment of the bank's claim, so that she may be relieved of liability. She claims she should be preferred to the claims of the attaching creditors. The trustee was garnished by plaintiff and the other interveners prior to the time S. B. Jones began her action by intervention in the suit of plaintiff against Joseph A. Jones,

She had not acquired any lien on the fund, and we discover no reason for disturbing the decree as to her. In view of the disposition made of the case, we do not pass upon the motion of appellees. The decree below is, as to all of the appellants, AFFIRMED.